# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D2022-1863

———————————————

CHRISTOPHER PRETZER, et al.,

    Appellants,

    v.

RICK SWEARINGEN, individually,
MARK GLASS in his official
capacity, and FLORIDA
DEPARTMENT OF LAW
ENFORCEMENT,

    Appellees.[1]

———————————————

On appeal from the Circuit Court for Leon County.
Angela C. Dempsey, Judge.

July 19, 2024

---

[1] As the successor to Rick Swearingen as the Commissioner of the Florida Department of Law Enforcement, Mark Glass is automatically substituted for Swearingen to the extent that Swearingen was sued in his official capacity. *See* Fla. R. App. P. 9.360(c)(2). The automatic substitution provision does not apply to the extent that the appellants sued Swearingen in his individual capacity. *See* § 790.33(3)(c), Fla. Stat.; *cf. State v. City of Weston*, 316 So. 3d 398 (Fla. 1st DCA 2021), *opinion approved sub nom. Fried v. State*, 355 So. 3d 899 (Fla. 2023).

WINOKUR, J.

Appellants (hereinafter "Pretzer") brought an action against Appellees (hereinafter "FDLE") under section 790.33(3)(f), Florida Statutes, alleging that FDLE violated the preemption provision of section 790.33(1), by adopting a policy, rule, or regulation regarding firearms without specific authorization from the Legislature to do so.[2] Pretzer alleged that FDLE impermissibly deviated from the statutory process for firearm purchases outlined in section 790.065, Florida Statutes, and created a new category of potential firearms purchasers not authorized by the Legislature. In its answer, FDLE asserted exhaustion of administrative remedies as an affirmative defense and moved for judgment on the pleadings based on that defense. The trial court granted FDLE's motion, rendering final judgment against Pretzer, concluding that Pretzer first had to seek remedies on the preemption claim through administrative proceedings. Pretzer appeals that ruling.

In the opinion that follows, we discuss the applicable law, the trial court's interpretation of section 790.33, the provision of the Administrative Procedure Act ("APA") explicitly addressing exhaustion of administrative remedies, and the applicability of the doctrine of exhaustion of administrative remedies with regard to an action pursuant to section 790.33. Finding that the relief authorized by section 790.33(3)(f)1. *is* the remedy in this case, rather than any remedy available under the APA, we reverse the judgment of the trial court.

---

[2] The appellants are both individual and organizational plaintiffs, all claiming to have suffered some form of harm because of the purported violation.

# I
## *Applicable Statutes*

### A
#### *Rulemaking Authority*

We begin by discussing a state agency's authority to adopt rules to manage its duties. An administrative agency created by the Legislature has no inherent authority to adopt rules. *See* § 120.54(1)(e), Fla. Stat. ("No agency has inherent rulemaking authority . . . ."); *see also Fairfield Cmtys. v. Fla. Land & Water Adjudicatory Comm'n*, 522 So. 2d 1012, 1014 (Fla. 1st DCA 1988) (noting that "any rulemaking authority which the legislature may validly delegate to the administrative agency is limited by the statute conferring the power . . . ."). At the very least, an enabling statute is required. *See* § 120.536(1), Fla. Stat. ("An agency may adopt only rules that implement or interpret the specific powers and duties granted by the enabling statute."). Regulation of any subject outside the Legislature's grant of rulemaking authority is invalid. *Id.* ("Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than implementing or interpreting the specific powers and duties conferred by the enabling statute."); *see also* § 120.52(8)(b), Fla. Stat. ("A proposed or existing rule is an invalid exercise of delegated legislative authority if . . . . [t]he agency has exceeded its grant of rulemaking authority . . . .").

### B
#### *Section 790.33*

In 1987, the State enacted the Joe Carlucci Uniform Firearms Act, which created section 790.33. *See* Ch. 87-23, Laws of Fla. In it, the Legislature preempted all local regulation regarding firearms. In pertinent part, the original version of section 790.33(1) stated as follows:

> PREEMPTION.—Except as expressly provided by general law, the Legislature hereby declares that it is occupying the whole field of regulation of firearms and ammunition, including the purchase, sale, transfer,

taxation, manufacture, ownership, possession, and transportation thereof, to the exclusion of all existing and future county, city, town, or municipal ordinances or regulations relating thereto. Any such existing ordinances are hereby declared null and void.

§ 790.33(1), Fla. Stat. (1987).

In 2011, the Legislature amended section 790.33(1), expanding the scope of preemption to include all state agencies. *See* Ch. 11-109, § 1, Laws of Fla. The portions underlined here were added to section 790.33(1):

Except as expressly provided by the State Constitution or general law, the Legislature hereby declares that it is occupying the whole field of regulation of firearms and ammunition . . . to the exclusion of all existing and future county, city, town, or municipal ordinances or any administrative regulations or rules adopted by local or state government relating thereto. Any such existing ordinances, rules, or regulations are hereby declared null and void.

*Id.*

"Preemption" of rules or regulations adopted by a state agency is somewhat different than preemption of county or municipal rules or ordinances. Preemption typically "takes a topic or a field in which local government might otherwise establish appropriate local laws and reserves that topic for regulation exclusively by the [State] legislature." *City of Hollywood v. Mulligan*, 934 So. 2d 1238, 1243 (Fla. 2006). If the State wishes to prevent counties or municipalities from legislating on a subject, legislative preemption may be necessary because counties and municipalities have relatively broad lawmaking authority. *See* Art. VIII, § 1(f), Fla. Const. (giving non-charter counties "such power of self-government as is provided by general or special law"); Art. VIII, § 1(g), Fla. Const. (giving charter counties "all powers of local self-government not inconsistent with general law"); Art. VIII, § 2(b), Fla. Const. (providing that municipalities "may exercise any power for municipal purposes except as otherwise provided by law").

But, as stated above, state agencies possess more limited powers to adopt rules and regulations. *See* § 120.536, Fla. Stat.; *see also WHS Trucking LLC v. Reemployment Assistance Appeals Comm'n*, 183 So. 3d 460, 462 (Fla. 1st DCA 2016) (noting that agencies "only have the authority . . . conferred by statutes"). State agency rulemaking is circumscribed by delegated legislative authority, even without the limitations that section 790.33(1) imposes. What section 790.33(1) prohibits beyond the limitations in rulemaking already imposed is a key issue in Pretzer's suit against FDLE. For lack of a better term, we characterize the 2011 amendments to the statute as "un-delegating" (rather than preempting) some of the regulatory power previously provided to state agencies.

The 2011 amendments invalidated any existing firearm or ammunition regulation adopted by an agency under a general grant of rulemaking authority. *See* § 790.33(1), Fla. Stat. ("Any such existing ordinances, rules, or regulations are hereby declared null and void."). Moreover, because the Legislature declared null and void all existing rules that conflicted with the preemption statute, no agency regulations based on a general grant of rulemaking authority were "grandfathered in." *Cf. County of Volusia v. DeSantis*, 302 So. 3d 1001, 1004 (Fla. 1st DCA 2020) (rejecting a county's argument that its charter amendments governing the selection and function of county constitutional officers were "grandfathered in" and remained in effect despite passage of a constitutional amendment eliminating that previously authorized home-rule power). Additionally, the 2011 amendments withdrew all legislative authority for future firearms or ammunition regulations when such regulations are based only on the general language of an agency's enabling statute. *See* § 790.33, Fla. Stat. (prohibiting the enactment of new ordinances or regulations "unless specifically authorized by this section or general law"); *cf. Fried v. State*, 355 So. 3d 899, 908 (Fla. 2023) (discussing the effect of preemption on the authority of local officials to regulate firearms).

After the passage of the 2011 amendments, an agency may regulate firearms and ammunition only under a "specific" grant of rulemaking authority. *See Fla. Carry, Inc. v. Univ. of N. Fla.*, 133 So. 3d 966, 972–73 (Fla. 1st DCA 2013) (en banc) (explaining that

5

a state agency, even one deriving its authority directly from the state constitution, is not authorized to enact rules or policies restricting the right to bear arms without a specific legislative delegation). And absent a specific grant of rulemaking authority, any agency action that contravenes section 790.33 is *ultra vires* and therefore null and void. *See Nat'l Rifle Ass'n of Am., Inc. v. City of S. Miami*, 812 So. 2d 504, 506 (Fla. 3d DCA 2002) (holding that a city's ordinance is "null and void as it is in conflict with section 790.33, Florida Statutes"); *cf. Masone v. City of Aventura*, 147 So. 3d 492, 498 (Fla. 2014) (finding ordinances imposing penalties for red light violations "invalid because they are expressly preempted by state law").

In addition to expanding the scope of section 790.33(1) to include state agencies, the 2011 amendments created a mechanism for plaintiffs to sue governmental entities that violate the statute. *See* Ch. 11-109, § 3, Laws of Fla. Specifically, the Legislature created a private cause of action so that those "adversely affected" could seek redress of a grievance in a court of law. *See* § 790.33(3)(f)1., Fla. Stat.

Under that cause of action, a plaintiff may sue both governmental entities and government officials. *See* § 790.33(3)(a), Fla. Stat. ("Any person, county, agency, municipality, district, or other entity that violates the Legislature's occupation of the whole field of regulation of firearms and ammunition . . . *shall* be liable as set forth herein." (emphasis supplied)). A plaintiff may seek declaratory relief, injunctive relief, actual damages, as well as reasonable attorney's fees and costs by filing an action in court. *See* § 790.33(3)(f)1., Fla. Stat. While government officials cannot be subject to damage awards under subsection 790.33(3)(f)1.b., they can face civil fines under subsection 790.33(3)(c). *See Fried*, 355 So. 3d at 904 (stating that civil fines and penalties under subsections (3)(c) and (3)(d) apply to "officials" whereas attorney's fees, costs, and damages under subsection (3)(f) apply to "governments").

6

## C
### *Regulating Sale of Firearms*

Sections 790.065 and 790.0655, Florida Statutes, generally regulate the sale and purchase of firearms. Among other things, section 790.065(1)(a) requires a dealer to request that FDLE conduct a criminal background check on a potential buyer. Based on this check, FDLE must inform the dealer whether the buyer is prohibited from purchasing firearms and provide the dealer with an approval number; a nonapproval number; or in some specified circumstances, a conditional nonapproval number. § 790.065(2)(b), (c)1., Fla. Stat.

If FDLE issues a conditional nonapproval, then it must determine whether the potential buyer is prohibited from purchasing firearms within 24 working hours. § 790.065(2)(c)2., Fla. Stat. If, within the 24 working hour period, FDLE cannot determine whether a potential buyer issued a conditional nonapproval is eligible, then it must provide the dealer with a conditional approval number. § 790.065(2)(c)5., Fla. Stat.

Section 790.065 also provides a remedy to those persons "denied the right to receive or purchase firearms as a result of the procedures established by this section," allowing them to "request a criminal history records review and correction in accordance with the rules promulgated by the Department of Law Enforcement." § 790.065(6), Fla. Stat.

Section 790.0655(1)(a) establishes a three-day waiting period for the purchase and delivery of firearms. Before 2018, this statutory provision specified that "[t]here shall be a mandatory 3-day waiting period, which shall be 3 days, excluding weekends and legal holidays, between the purchase and the delivery at retail of any handgun." § 790.0655(1)(a), Fla. Stat. (2017). But in 2018, the Legislature enacted the Marjory Stoneman Douglas High School Public Safety Act, which in part amended this provision to read, "[t]he mandatory waiting period is 3 days, excluding weekends and legal holidays, or expires upon the completion of the records checks required under s. 790.065, *whichever occurs later*." Ch. 2018-3, §§ 1, 12, Laws of Fla. (emphasis supplied).

7

## II
### *Pretzer's Complaint*

In the second amended complaint,[3] Pretzer claimed that FDLE is statutorily authorized to issue only one of the following "three responses [to a potential buyer] in regard to a background check performed for the purchase of a firearm": approval, nonapproval, or conditional nonapproval. According to Pretzer, FDLE impermissibly modified the statutorily prescribed process by creating a fourth class of potential buyers: those with a "decision pending" status under section 790.0655. Pretzer claimed that those who fall in that new category lack the benefits of the statutory process and remedy provided in section 790.065.

Specifically, Pretzer challenged FDLE's interpretation of the change to section 790.0655(1)(a) resulting from the Marjory Stoneman Douglas High School Public Safety Act. According to Pretzer, FDLE "seized upon . . . in-artfully drafted language [in the 2018 amendment] to claim the ability to indefinitely delay a constitutional right [to bear arms] without any due process for an indefinite time period, without any opportunity for review or challenge."

Discounting FDLE's reliance on the "whichever occurs later" language located at the end of the second sentence of subsection 790.0655(1)(a), Pretzer alleged that the phrase "completion of the records checks required under s. 790.065" contained in the middle of that second sentence "means that the records check must be concluded no later than the 24 working hours required by" section 790.0655. According to Pretzer, subsection 790.0655(1)(a) does not authorize FDLE to take however long it feels is necessary to perform the required check.

Finally, Pretzer alleged that FDLE, by creating a new class of potential buyers, "promulgated or enacted a policy rule or regulation without the authority to do so [under section 790.065]

---

[3] FDLE had sought dismissal of part or all of two previous versions of Pretzer's pleading.

8

and in direct contravention of Sec. 790.33, Fla. Stat."[4] Pretzer claimed that these violations caused him and the other plaintiffs varying degrees of harm. He sought declaratory, injunctive, and monetary relief, as permitted by section 790.33(3)(f)1.

FDLE answered this last iteration of Pretzer's complaint, asserting a host of what it characterized as affirmative defenses. In one of the defenses, FDLE asserted that Pretzer had failed to exhaust all available administrative remedies before filing suit. It later moved for judgment on the pleadings, relying on this exhaustion defense. FDLE characterized Pretzer's complaint as an attack on an FDLE rule—in particular, Rule 11C-6.009 of the Florida Administrative Code—and argued that such complaints must be brought under the APA, specifically section 120.56, Florida Statutes, at the Division of Administrative Hearings in the first instance. According to FDLE, by filing a civil action in circuit court instead of a rule challenge in an administrative forum, Pretzer failed to exhaust all available administrative remedies. Regarding section 790.33, FDLE argued that the Legislature did not rescind any rulemaking authority to administrative agencies.

For his part, Pretzer denied that he was challenging Rule 11C-6.009, and was instead challenging FDLE's exercise of regulatory authority that is inconsistent with sections 790.065 and 790.0655, so there was no administrative remedy for him to exhaust. The court granted the motion and rendered judgment in favor of FDLE, ruling that Pretzer's claim was essentially a rule challenge, requiring him to exhaust his remedies under the APA before filing an action in circuit court.

## III
### *Analysis*

We review de novo a trial court's decision to grant a motion for judgment on the pleadings. *See Reinhard v. Bliss*, 85 So. 2d 131, 133 (Fla. 1956).

---

[4] Although we describe Pretzer's claims, we do not address their merits, given the procedural posture of the case.

In the order granting FDLE's motion for judgment on the pleadings, the trial court correctly identified Pretzer's claim: that FDLE's actions were "outside the scope of [its] authority, as codified within sections 790.065 and 790.0655, Florida Statutes, and are therefore preempted under section 790.33, Florida Statutes." The court even described Pretzer's claim as a "preemption claim." Nevertheless, the trial court concluded that Pretzer's claim was a "quintessential rule challenge." Instead of focusing on the statutory authority for Pretzer's complaint, the trial court focused on the nature of the complaint and ruled that "[i]n all but name, [Pretzer's] complaint is a rule challenge." Because Pretzer's preemption claim looks like a rule challenge, according to the trial court, it must be one—regardless of whether section 790.33 provides a cause of action separate from the APA.

After classifying Pretzer's complaint under section 790.33 as a rule challenge, the trial court faulted Pretzer for filing his complaint "in the wrong forum," presumably because the APA provides for a rule challenge. Finding that Pretzer failed to exhaust "all available administrative remedies," the trial court rendered final judgment in favor of FDLE. For the following reasons, we reject this conclusion.

A

*Trial Court Order*

In granting final judgment on the pleadings, the trial court misapprehended the preemption language of subsection 790.33(1). Specifically, the trial court ignored the phrase, "[e]xcept as expressly provided," and misinterpreted the term "general law" to mean that FDLE can rely on the general grant of rulemaking authority found in its enabling statute to regulate the purchase of firearms and ammunition, stating the following:

> [T]here is no suggestion that Section 790.33 was intended to strike the APA, circumvent its application to FDLE's rules and policies, or even address the enactment of rules within the authority conferred by the Legislature. In fact, by its plain language, Section 790.33 specifically exempts the APA, *a general law*, from its reach.

10

(emphasis supplied).[5]

As to State agencies, the trial court's interpretation of section 790.33(1) renders meaningless the preemption language expressly contained in the statute. The following table illustrates this conclusion.

**Actual Language of § 790.33(1) vs.
Trial Court's Interpretation**

| | Rule | Exception |
|---|---|---|
| **§ 790.33(1)** | "[T]he Legislature hereby declares that it is occupying the whole field of regulation of firearms and ammunition" | "Except as expressly provided by the State Constitution or general law" |
| **Trial Court's Interpretation** | An administrative agency may not regulate firearms and ammunition. | Except as provided by the State Constitution or any source of general rulemaking authority. |

If, as the trial court found, section 790.33(1) limits an agency's rulemaking authority to the Constitution, the APA, and an agency's enabling statute, then the state-agency provision of section 790.33(1) proscribes nothing that the APA does not already proscribe. *See, e.g.*, § 120.536(1), Fla. Stat. (prohibiting an agency from adopting rules unless they "implement or interpret the specific powers and duties granted by the enabling statute"). Under the trial court's interpretation, the 2011 amendments to section 790.33(1) took nothing back from administrative agencies.

---

[5] The enabling statute relied upon here is section 943.03(4), Florida Statutes, which empowers FDLE to "adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of law conferring powers or duties upon it."

Indeed, under the trial court's interpretation, it is hard to see what impact the 2011 amendments had on state agencies at all.

To support its decision, the trial court relied on the "Policy and Intent" statement contained in subsection (2) of section 790.33. The court stated that "[T]he Legislature expressed its intent to 'declare all ordinances and regulations null and void which have been enacted *by any jurisdictions other than state and federal*."

As originally enacted and as it exists currently, subsection (2)(a) states the following:

> It is the intent of this section to provide uniform firearms laws in the state; to declare all ordinances and regulations null and void which have been enacted by any jurisdictions *other than state* and federal, which regulate firearms, ammunition, or components thereof; to prohibit the enactment of any future ordinances or regulations relating to firearms, ammunition, or components thereof unless specifically authorized by this section or general law; and to require local jurisdictions to enforce state firearms laws.

Ch. 87-23, § 4, Laws of Fla.; § 790.33(2)(a) Fla. Stat. (emphasis supplied). Read in isolation, paragraph (2)(a) could be interpreted as exempting state agencies from the preemption statute.

We rejected this reading of subsection (2) in *Florida Carry, Inc. v. University of North Florida*:

> Previously, this statute only explicitly preempted the regulation of firearms by local government. However, in October 2011, the legislature added the phrase "any administrative regulations or rules adopted by local or state government" to emphasize and reiterate that the regulation of firearms was solely within the purview of the legislature and not within the jurisdiction of local governments or agencies of the state government using their rulemaking power. It is presumed that in adopting an amendment, the legislature intends to change the meaning of a statute unless a contrary intention is clearly

12

expressed. As such, we must interpret the statute to preempt the regulation of the right to bear arms from state governmental entities as well as local government. *To rule otherwise and permit a state agency to enact rules or policies restricting the right to bear arms without a specific legislative delegation would render the 2011 amendment superfluous.*

*See* 133 So. 3d at 972 (emphasis supplied) (citations omitted). Therefore, to the extent that the trial court relied on subsection (2) of section 790.33 to conclude that subsection (1) does not limit FDLE's authority to regulate firearms, it erred.

B

1
*Section 120.56(1)(e)*

The trial court did not merely fault Pretzer for bringing his action in the "wrong forum" because it was really a rule challenge. The court also ruled that by filing suit in circuit court instead of a rule challenge pursuant to the APA, Pretzer failed to "exhaust all available administrative remedies," concluding that "[f]or this reason" judgment for FDLE was warranted.

The short response to this conclusion is contained in the APA itself. The trial court was clear that Pretzer was required to file a rule challenge pursuant to section 120.56 in order to meet his obligation to exhaust administrative remedies. Yet that very statute belies any such claim:

Failure to proceed under this section does not constitute failure to exhaust administrative remedies.

§ 120.56(1)(e), Fla. Stat.

Thus, the statute that supposedly sets forth the administrative remedy Pretzer was required to seek before filing suit in fact unequivocally states that no such action is necessary. Pretzer was not required to file a rule challenge for the purpose of exhausting administrative remedies, and the court erred by

13

concluding otherwise. Regardless of whether we agree with the trial court's conception of the exhaustion requirement, this statutory provision is sufficient alone to defeat FDLE's claim that Pretzer was required to exhaust administrative remedies by mounting a rule challenge before he filed suit.

We reject FDLE's reading of section 120.56(1)(e) that it is "directed to appellate courts (not circuit courts)," in that all it means is that appellate review of an order following a section 120.57, Florida Statutes, proceeding is not precluded if the appellant did not also raise a rule challenge under section 120.56. This reading is inconsistent with the plain language of section 120.56(1)(e), which is not limited to appellate action. FDLE claims that *State ex rel. Department of General Services v. Willis*, 344 So. 2d 580 (Fla. 1st DCA 1977), supports this position. *Willis* held that section 120.56 should not be read to permit appellate courts to "rebuff rule challenges by petitions to review 120.57 proceedings because petitioner did not 'exhaust' the rule-challenge remedies" of section 120.56. 344 So. 2d at 592. Perhaps so, but limiting the meaning of section 120.56(1)(e) to this situation is inconsistent with the statutory language. To the extent we suggested otherwise in *Willis*, that statement was *dictum*. *Willis* involved a suit to enjoin an agency from completing a bid even though the APA contains bid protest procedures, not a suit that the agency claimed was actually a rule challenge.

Even if section 120.56(1)(e) did not conclusively refute FDLE's exhaustion argument, we find that a plaintiff is not required to exhaust administrative remedies under the APA before filing a suit authorized by section 790.33(3)(f)1.

2
*Trial Court's Exhaustion Analysis*

In support of its decision, the trial court explained exhaustion of administrative remedies as follows: "The doctrine of exhaustion is not concerned with any particular administrative remedy, but rather asks only whether a litigant has an available administrative remedy . . . ." Based on that broad conception of the doctrine, the court determined that the "rule challenge provisions set forth in Section 120.56 are available to Plaintiffs in the first

14

instance to test their theories regarding the 'enactment' and 'enforcement' [of FDLE's rule]." While this articulation of the doctrine is consistent with the description given in *Florida Carry, Inc. v. Thrasher*, 315 So. 3d 771 (Fla. 1st DCA 2021), it is in fact inconsistent with the correct usage of the doctrine.

a
*Exhaustion in General*

As a matter of basic administrative law, a party challenging an agency action or decision must exhaust all administrative remedies before seeking judicial review. *See* 4 The Late Charles J. Koch, Jr. & Richard Murphy, Admin. L. & Prac. § 12:21 (3d ed. 2024); 2 Tracy Bateman et al., Fla. Juris. Admin. L. § 405 (2d ed. 2024). This does not mean that no legal action against a governmental entity can ever be maintained until the plaintiff has first invoked some administrative proceeding conceivably related to the subject matter. The doctrine requiring the exhaustion of administrative remedies is a "court-created prudential doctrine," and whether it should be required in any particular instance is a "matter of policy." *Dep't of Revenue v. Brock*, 576 So. 2d 848, 850 (Fla. 1st DCA 1991) (citations omitted); *see also McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (superseded by statute on other grounds) (noting that the Supreme Court has "declined to require exhaustion in some circumstances even where administrative and judicial interests would counsel otherwise" and that the determination of whether administrative remedies must be exhausted requires courts to "balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion"). Exhaustion of administrative remedies should be required only when it promotes the purposes of the doctrine.

The Supreme Court summarized those purposes in *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975), as follows:

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of

15

its experience and expertise, and to compile a record which is adequate for judicial review.

*See also McCarthy*, 503 U.S. at 145 (holding that "[e]xhaustion is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency").

*McCarthy v. Madigan* identified several circumstances "in which the interests of the individual weigh heavily against requiring administrative exhaustion." *Id*. These circumstances include the following:

1. when "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action;"

2. when "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief[,]'" such as "where the challenge is to the adequacy of the agency procedure itself;" and,

3. when "the administrative body is shown to be biased or has otherwise predetermined the issue before it."

*Id*. at 146–48.[6]

A determination of whether to require prior administrative exhaustion should examine "both the nature of the claim presented and the characteristics of the particular administrative procedure provided." *Id*. at 146. Accordingly, we begin by looking at the nature of the claim presented.

---

[6] By identifying "exceptions," the Supreme Court did not suggest that courts should apply a presumption in favor of exhaustion, which can only be overcome if an "exception" is proven. The "exceptions" appear to be simply factors that may be taken into account in determining whether to impose an administrative exhaustion requirement.

b

i
*Nature of the Claim Presented*

As stated above, section 790.33(1) announces that "the Legislature is occupying the whole field of regulation of firearms and ammunition." Even though this preemption language had been in the statute for 24 years by 2011, in that year the Legislature presumably felt it necessary to create an enforcement mechanism for its preemption of firearm regulation, explicitly creating a cause of action authorizing persons or organizations to "file suit" against governmental bodies for violating the preemption requirements of subsection (1). *See* § 790.33(3)(f)1., Fla. Stat. Needless to say, the statute does not require a plaintiff to exhaust administrative remedies before filing suit. Given that the very purpose of subparagraph (3)(f)1. is to authorize a lawsuit against the government to enforce subsection (1), it seems unlikely that the Legislature would want courts to require that a plaintiff entreat the agency itself before the plaintiff could file suit.

One may conclude that we could end the analysis here. The statute on its face permits suit in court to enforce an explicit cause of action, without obligating a plaintiff to first seek redress through any administrative process. Imposing an administrative exhaustion requirement in this circumstance could be viewed as judicial interference with clear legislative guidance.

In this regard, this case is similar to *McCarthy*, where the petitioner filed suit against prison officials under 28 U.S.C. § 1331, alleging Eighth Amendment violations. *See McCarthy v. Maddigan*, 914 F.2d 1411, 1411 (10th Cir. 1990), *rev'd sub nom. McCarthy v. Madigan*, 503 U.S. 140 (1992). Even though the statute did not contain a prior-exhaustion requirement, the respondents claimed that the petitioner had to exhaust administrative remedies through the Bureau of Prisons before filing suit. *McCarthy*, 503 U.S. at 142. The Supreme Court unanimously rejected that claim. A majority noted that its determination of whether exhaustion was required must be "consistent with congressional intent and any applicable statutory scheme" in order to give "appropriate deference to Congress' power

17

to prescribe the basic procedural scheme under which a claim may be heard . . . ." *Id.* at 144. In other words, because the legislature provides a statutory cause of action without requiring administrative exhaustion, courts were not free to impose one.[7]

But even if the lack of an administrative exhaustion requirement in a statute creating a cause of action did not conclusively reject such requirement, we would still find that the statute itself is inconsistent with the requirement. An exhaustion requirement is also inconsistent with subparagraph (3)(f)2. of section 790.33, which reads as follows: "If after the filing of a complaint a defendant voluntarily changes the ordinance [or] regulation [at issue in the suit], with or without court action, the plaintiff is considered a prevailing plaintiff for purposes of this section." In other words, if the defendant revises the contested ordinance or regulation as a result of the litigation to make it consistent with state law, the plaintiff is still entitled to the remedies set forth in subparagraph (3)(f)1. This provision demonstrates that the Legislature was not interested in permitting the governmental entity to avoid liability by "correct[ing] its own errors." *Weinberger*, 422 U.S. at 765. Put another way, if an agency uses an administrative exhaustion requirement to correct its own errors and thereby avoid a lawsuit—a basic purpose of administrative exhaustion—it would conflict with the statutory intent to impose liability even when the agency corrected its errors.

An administrative exhaustion requirement is also inconsistent with the purpose of the statute, as indicated in the statute itself. "Legislative purpose" is "of paramount importance" in determining whether to impose an administrative exhaustion requirement on a statutory cause of action. *Patsy v. Bd. of Regents*

---

[7] Shortly after *McCarthy*, presumably in response to it, Congress enacted the Prison Litigation Reform Act of 1995, which imposes an administrative exhaustion requirement for federal prisoner litigation. *See Woodford v. Ngo*, 548 U.S. 81, 84 (2006). This is why *McCarthy* is "superseded by statute." It remains to be seen whether the Florida Legislature will enact an administrative exhaustion requirement for section 790.33 lawsuits.

*of State of Fla.*, 457 U.S. 496, 501–02 (1982). The statutory intent apparent in section 790.33(3)(f) is inconsistent with an administrative exhaustion requirement. The Legislature provided Pretzer with a judicial remedy and did not require administrative exhaustion before he could seek that remedy.

Imposing an administrative exhaustion requirement is often viewed as protecting the executive branch from unwarranted judicial interference. *See Key Haven Associated Enters., Inc. v. Bd. of Trs. of Internal Imp. Tr. Fund*, 427 So. 2d 153, 157 (Fla. 1982) (noting that "[j]udicial intervention in the decision-making function of the executive branch must be restrained in order to support the integrity of the administrative process and to allow the executive branch to carry out its responsibilities as a co-equal branch of government"). But when courts impose an administrative exhaustion requirement to obstruct a statutorily created cause of action that contains no such precondition to suit, they are not protecting another branch of government from judicial interference; to the contrary, the imposition *is* judicial interference in the lawmaking function of the legislative branch.[8]

Accordingly, the "nature of the claims presented" weighs heavily against imposing an administrative exhaustion requirement. *McCarthy*, 503 U.S. at 146.

ii
*Characteristics of a Rule Challenge*

We turn now to the "characteristics of the particular administrative procedure provided." *Id.* FDLE claims that an administrative challenge to its rules pursuant to section 120.56 provides an adequate remedy to Pretzer, and therefore it must be sought before he can file suit under section 790.33. Beyond the fact that the statute creating the cause of action requires no such

---

[8] *See, e.g.*, *Schmitt v. State*, 590 So. 2d 404, 414 (Fla. 1991) (noting "Florida's strong adherence to a strict separation of powers doctrine" as set forth in Art. II, section 3 of the Florida Constitution).

procedure, we find that a rule challenge under section 120.56 is inconsistent with a section 790.33 action.

First, as stated above, section 120.56 imposes a different standard than section 790.33. Section 120.56 permits a person to "seek an administrative determination of the invalidity of the rule on the ground that the rule is an invalid exercise of delegated legislative authority." In defining "invalid exercise of delegated legislative authority," the APA notes that "[a]n agency may adopt only rules that implement or interpret the specific powers and duties granted by the enabling statute." § 120.52(8), Fla. Stat. But section 790.33(1) imposes a different standard. An agency cannot regulate firearms merely because the regulation is permitted by the enabling statute; indeed, no regulations or rules regarding firearms are permitted "[e]xcept as *expressly* provided by the State Constitution or general law." § 790.33(1), Fla. Stat. (emphasis supplied). Because we do not rule on the merits of Pretzer's complaint, we do not opine whether the rules in question are permissible under this provision. We do find, however, that the standard for a rule challenge under section 120.56 (whether the rule is an invalid exercise of delegated legislative authority) is markedly different than the standard for imposing liability under section 790.33 (whether the rule is specifically authorized by this section or by general law). An administrative law judge may be authorized to decide whether an agency rule meets the requirements of the APA, but is not authorized to determine whether an agency rule forecloses liability under section 790.33.

Second, the remedy available in a section 120.56 challenge is a determination that the rule is invalid. § 120.56(1)(a), Fla. Stat. In contrast, a prevailing plaintiff in a section 790.33 suit can recover "[t]he actual damages incurred, but not more than $100,000." § 790.33(3)(f)1.b., Fla. Stat. FDLE brushes aside this distinction by noting that a successful rule challenger could then file a section 790.33 suit, and recover damages there. This reasoning is circular: if a person must file suit to obtain damages, then a rule challenge (where damages are unavailable) is not an adequate remedy. Indeed, a minority of the Supreme Court ruled in the plaintiff's favor in *McCarthy* solely because the asserted administrative remedy "does not provide for any award of monetary damages." 503 U.S. at 156 (Rehnquist, C.J., concurring).

20

FDLE also argues that a rule challenger under section 120.56 can recover attorney's fees. While it is true that a successful rule challenger can recover attorney's fees, the agency is not liable for fees if it "demonstrates that its actions were substantially justified or special circumstances exist which would make the award unjust." § 120.595(2), Fla. Stat. But the Legislature imposed no such limitation on recovery of fees in a suit under section 790.33(f)(3). The statute even permits a contingency fee multiplier and the only limitation it places upon fees is that they be "[r]easonable." § 790.33(3)(f)1.a., Fla. Stat. In short, a successful rule challenger would not be entitled to attorney's fees in the same manner as a successful section 790.33(3)(f) plaintiff.

Another relevant characteristic of a rule challenge is the decision-making process involved. FDLE correctly notes that the administrative exhaustion doctrine is based in part on the need "to enable the agency . . . to apply its discretion and expertise in the first instance to technical subject matter," citing *Florida High School Athletic Ass'n v. Melbourne Central Catholic High School*, 867 So. 2d 1281, 1286 (Fla. 5th DCA 2004). But a rule challenge in no way invokes the agency's "expertise." A rule challenge is not filed with the agency in order to seek its specialized knowledge regarding the subject matter. It is filed directly with the Division of Administrative Hearings, which assigns an administrative law judge to conduct a hearing. § 120.56(1)(c), Fla. Stat. The agency is only a party to that proceeding, and the administrative law judge's order on the challenge is final agency action. § 120.56(1)(e), Fla. Stat. In short, FDLE can invoke its expertise in a rule challenge the same way it would in a 790.33 suit: as a party to the proceeding. Nothing about the administrative process allows FDLE to invoke its expertise in any manner that it could not in a section 790.33(3)(f) suit. Accordingly, this factor also weighs against requiring administrative exhaustion.

3

*Primary Jurisdiction*

We further note that some of FDLE's argument seems to conflate the doctrine of exhaustion of administrative remedies with the doctrine of primary jurisdiction. These are "companion doctrines" but "not synonymous." *Flo-Sun, Inc. v. Kirk*, 783 So. 2d

21

1029, 1037 n.5 (Fla. 2001). "'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process runs its course." *Id.* (quoting *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)). While

> [p]rimary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its review.

*Id.* Based on this distinction, the Florida Supreme Court explained that

> the doctrine of exhaustion arises as a defense to judicial review of an administrative action and is based on the need to avoid premature interruption of the administrative process; whereas primary jurisdiction operates where a party seeks to invoke the original jurisdiction of a court to decide issues which may require resort to administrative expertise.

*Id.*

The Florida Supreme Court's explanation exposes some overbroad application of the exhaustion doctrine. Exhaustion is meant to "avoid premature interruption of the administrative process." As Pretzer's suit did not interrupt any administrative process, the doctrine does not seem to apply. On the other hand, FDLE seems to argue that Pretzer's lawsuit requires the court "to decide issues which may require resort to administrative expertise," as *Flo-Sun, Inc.* puts it. *Id.* These concepts seem to be conflated in much of the case law in this area. To the extent that the doctrine of primary jurisdiction might require a court to

"suspend" Pretzer's lawsuit and "refer" the case to FDLE, we do not address that issue because FDLE never raised it.[9]

4

*Florida Carry v. Thrasher*

This conflation may account for some of our approach in *Thrasher*. There, we held that a plaintiff may not file an action authorized by section 790.33(3)(f) against a university and its president regarding university firearms regulations without exhausting administrative remedies. *Thrasher*, 315 So. 3d at 772. The administrative remedies in question were adopted under the authority of section 1001.706(2)(c), Florida Statutes. This statute permits the Board of Governors, which regulates the State University System, to adopt rules for universities, and notes that the rule adoption process must provide "a process for a substantially affected person to challenge an unlawful regulation." Beyond identifying the statutory ground for the administrative process, the *Thrasher* opinion does not describe any such process for a person to challenge the university regulation, simply stating that an administrative remedy authorized by section 1001.706(2)(c) and the cause of action permitted by section 790.33(3)(f) "can co-exist without depriving a party of its constitutional or statutory rights absent extraordinary circumstances." *Id*. From this premise, the *Thrasher* court concluded that the plaintiff failed to exhaust available administrative remedies.

The question whether the administrative remedy and the statutory cause of action can "co-exist" does not resolve the question of whether a suit must be dismissed for failure to exhaust administrative remedies. In this case, for example, it is undisputed that a person could file a rule challenge pursuant to section 120.56 rather than a suit pursuant to section 790.33(3)(f). *Thrasher*

---

[9] Nor do we address whether the doctrine of primary jurisdiction survives the adoption of Article V, section 21, of the Florida Constitution, which prohibits a court or hearing officer from deferring to an administrative agency's interpretation of a statute or rule.

merely states that administrative exhaustion is generally required and that no "exception" exists. *Id*. *Thrasher* does not, however, discuss how the administrative process involved can adequately vindicate the rights of a person under section 790.33(3)(f). Nor does *Thrasher* explain why we should condition a statutorily created cause of action on an administrative process that not only does the statute not require, but also (as discussed above) is inconsistent with the statute. For this reason, we recede from *Thrasher* to the extent that it is inconsistent with this opinion.

IV
*Conclusion*

Even if we did not rely explicitly on section 120.56(1)(e) to conclude that a plaintiff need not exhaust an APA rule challenge before filing suit under section 790.33(3), we still conclude that Pretzer was not required to exhaust an administrative remedy. Pretzer does not raise "a quintessential rule challenge." Rather, he raises a legislative preemption challenge. With the 2011 amendments to section 790.33, the Legislature expressly provided Pretzer with a judicial remedy—not an administrative one. Because the relief authorized by section 790.33(3)(f)1. *is* the remedy in this case, Pretzer could bring an action under section 790.33(3)(f) in circuit court without exhausting any administrative remedies.

Therefore, we REVERSE the judgment rendered in favor of FDLE.

OSTERHAUS, C.J., and LEWIS, ROBERTS, ROWE, RAY, BILBREY, KELSEY, M.K. THOMAS, and LONG, JJ., concur.

TANENBAUM, J., concurs in part with an opinion, in which B.L. THOMAS, J., joins.

NORDBY, J., recused.

24

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330.*

TANENBAUM, J., concurring in part.

The holding here is narrow but important. We reverse the trial court's judgment against the individual and organizational plaintiffs—themselves simply pursuing the public cause of action that the Legislature created for them in section 790.33, Florida Statutes—because, contrary to the trial court's rationale, that statute does not require pursuit of any administrative remedy as a condition precedent for suing. This holding overrules *Florida Carry, Inc. v. Thrasher*, 315 So. 3d 771 (Fla. 1st DCA 2021), on which the trial court primarily relied. I both concur in this holding and agree *Thrasher* was wrongly decided, writing separately only to highlight the straightforwardness of the applicable public-rights analysis that leads, inexorably, to our disposition.

"Exhaustion of administrative remedies," frequently labeled a "doctrine," is not so much that as it is a jurisprudential principle. *Cf. State, Dep't of Rev. v. Brock*, 576 So. 2d 848, 850 (Fla. 1st DCA 1991) ("The exhaustion requirement is a court-created prudential doctrine; it is a matter of policy, not of power."). The federal courts originated the principle as part of their equity jurisprudence, responding to requests to enjoin state agency taxation, foreclosing the writ of injunction against some agency-caused harm if the administrative process already offered an adequate remedy. *Cf. Dows v. City of Chicago*, 78 U.S. 108, 109–10 (1870) ("No court of equity will, therefore, allow its injunction to issue to restrain their action, except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law."); *Pittsburgh, C., C. & St. L. Ry. Co. v. Bd. of Pub. Works of W. Va.*, 172 U.S. 32, 37 (1898) (explaining that a federal court will not restrain the state collection of taxes by "writ of injunction" unless, among other things, "the owner of the property taxed has no adequate remedy by the ordinary processes of the law, and that there are special

25

circumstances bringing the case under some recognized head of equity jurisdiction"); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 & n.9 (1938) (noting "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted," a rule "most frequently applied in equity where relief by injunction was sought" but applied "to proceedings at law as well"); *Dundee Mortg. Tr. Inv. Co. v. Charlton*, 32 F. 192, 195 (C.C.D. Or. 1887) (dismissing equity bill seeking injunction against board of equalization and assessor over allegedly illegal mortgage tax because "it was the duty of the plaintiff, if dissatisfied with the assessment, to pursue the mode prescribed by the statute, relating to assessments" before suing in federal court for either review or writ).[1]

Not surprisingly, Florida courts expanded this general exhaustion principle to include suits seeking declaratory relief under Florida's general declaratory judgment statute. *Cf. Sch. Bd. of Flagler Cnty. v. Hauser*, 293 So. 2d 681, 682 (Fla. 1974) (holding that "declaratory action was not the correct method to review such alleged action of the school board" because "the declaratory decree

---

[1] *See* Raoul Berger, *Exhaustion of Administrative Remedies*, 48 YALE L.J. 981, 981–82 & n.1 (Apr. 1939) (discussing early history of the federal "doctrine" and positing that *Dundee Mortgage Trust Invest Co. v. Charlton* was its "earliest manifestation"); *see also id.* at 982–83 (characterizing the "corrective power" behind administrative remedies for a purportedly errant rule or regulation as "legislative in nature," noting the development of the exhaustion principle based on courts' inclination to postpone judicial relief until completion of "legislative action," because courts will not "enjoin the process of legislation"); *id.* at 985–86 (addressing how "the exhaustion rule was formulated in terms of *equity jurisdiction*," how the cases "again and again pointed out that there is no jurisdiction in equity in the absence of exhaustion"); *see generally* James E. Dunlap, *Administrative Law: Exhaustion of Administrative Remedies as a Prerequisite to Judicial Review*, 44 MICH. L. REV. 1035 (June 1946) (noting the principle's origins in equitable doctrines, highlighting its concomitantly discretionary nature even outside of equity).

26

statute is not a substitute for certiorari to review an administrative order of a state board or agency"); *Gulf Pines Mem'l Park, Inc. v. Oaklawn Mem'l Park, Inc.*, 361 So. 2d 695, 699 (Fla. 1978) (agreeing with "general proposition" that a "circuit court should refrain from entertaining declaratory suits except in the most extraordinary cases, where the party seeking to bypass usual administrative channels can demonstrate that no adequate remedy remains available under Chapter 120"); *Sch. Bd. of Leon Cnty. v. Mitchell*, 346 So. 2d 562, 568–69 (Fla. 1st DCA 1977) (holding that "rule challenge initiated by appellee based upon the record in this case is not of such character as would justify the intervention of the Circuit Court by a declaratory judgment proceeding" because administrative remedy was available through the APA); *but cf. Gulf Pines Mem'l Park, Inc.*, 361 So. 2d at 699 (noting, however, "that the Administrative Procedure Act does not and cannot displace circuit court jurisdiction to enjoin enforcement of facially unconstitutional agency rules"); *State Dep't of Envtl. Prot. v. PZ Const. Co., Inc.*, 633 So. 2d 76, 78 (Fla. 3d DCA 1994) ("Declaratory and injunctive relief is available as a remedy for adverse administrative action only in those extraordinary cases where a party has no other adequate administrative remedy to cure egregious agency errors or where a party's constitutional rights are endangered, or where the agency is alleged to have acted without colorable statutory authority and in excess of its delegated powers." (internal citations and quotations omitted)).

This extension of the exhaustion principle is not surprising because declaratory relief and injunctive relief are similar: both originating in equity, both being forms of "preventative justice," and both being "discretionary in the trial court." *See N. Shore Bank v. Town of Surfside*, 72 So. 2d 659, 661–62 (Fla. 1954); *Sheldon v. Powell*, 128 So. 258, 261 (Fla. 1930) ("Under the English practice, provision for declaratory judgments was established by rule of court which, though broad in application, is discretionary. The procedure for a declaratory judgment has become so important in that country that it is said that 60 per cent. [sic] of the equity cases are now brought under it."); *id.* at 262 ("In its inception, the purpose of the declaratory judgment was to serve as an instrument of preventive justice" and "is inhibitory of injury" (internal quotations omitted)); *id.* (explaining that the original "law authorizing declaratory decrees" was "restricted to suits in equity,"

requiring "that all proceedings brought under it shall conform to law and rules of court governing other proceedings in chancery, in so far as same may be applicable").

The provisions in chapter 86, Florida Statutes, governing declaratory relief in Florida's courts, are "nothing more than a legislative attempt to extend procedural remedies to comprehend relief in cases where technical or social advances have tended to obscure or place in doubt one's rights, immunities, status or privileges." *Ready v. Safeway Rock Co.*, 24 So. 2d 808, 809 (Fla. 1946). The procedural relief allowed by these provisions is not specific to one type of defendant or one type of legal dispute, but certainly has the force of judicial power. *See* § 86.011, Fla. Stat. (providing that a "declaration has the force and effect of a final judgment"). It is only prudential, then, for a court—determining in its discretion whether *externally* to provide preventative relief against an organ of the executive branch—to ask why its involvement is necessary under the provisions of chapter 86, if the Legislature has acted specifically through the APA to create a whole host of administrative remedies, available *within* the executive branch, for the same claimed injury. *See State, Dep't of Envtl. Reg. v. Falls Chase Special Taxing Dist.*, 424 So. 2d 787, 794 (Fla. 1st DCA 1982) (noting how the 1974 enactment of the APA (chapter 120, Florida Statutes) "afforded new administrative remedies and severely curtailed the need for extraordinary judicial relief," limiting the need for such judicial relief "in exceptional cases"); *State ex rel. Dep't of Gen. Servs. v. Willis*, 344 So. 2d 580, 590–91 (Fla. 1st DCA 1977) (noting how the APA's "impressive arsenal of varied and abundant remedies for administrative error requires . . . greater judicial deference to the legislative scheme," and how the act does not lessen "the power of the circuit courts" or neutralize "their historic writs," but merely "lessened" the number of "occasions for their intervention" and "reduce[d] the demand for them" (internal quotation and citation omitted)).

There was no need for the trial court's asking whether the relief sought by the appellants required its involvement, indeed no reason to explore the application of the "exhaustion doctrine" at all. The appellants—both individual and organizational plaintiffs—did not sue under chapter 86 for declaratory relief, pursuing instead several forms of relief, including money damages,

against the Florida Department of Law Enforcement ("FDLE") and its principal under section 790.33.[2] That provision allows for suits by "[a] person or an organization whose membership is adversely affected by any ordinance, regulation, measure, directive, rule, enactment, order, or policy, whether written or unwritten, promulgated or caused to be enforced in violation of this section," allowing such person or organization to seek "*in any court of this state having jurisdiction . . .* over any defendant to the suit for declaratory and injunctive relief and for actual damages, as limited herein, caused by the violation." § 790.33(3)(f)1., Fla. Stat. (emphasis supplied); *see also id.* (3)(a) (making governmental officers and entities liable for action in violation of the Legislature's statutory preemption).

With section 790.33(3)(f)1., the Legislature created a "public right" to judicial relief against the State, thereby waiving sovereign immunity and providing a statutory remedy for harms suffered from agency violations of the section. *See* Art. X, § 13, Fla. Const. (authorizing the Legislature to provide by general law for "suit against the state as to all liabilities now existing or hereafter originating"); *Circuit Court of Twelfth Judicial Circuit v. Dep't of Nat. Res.*, 339 So. 2d 1113, 1116–17 (Fla. 1976) (precluding judicial relief against the State in the absence of "legislation waiving the state's sovereign immunity"); *Rabideau v. State*, 409 So. 2d 1045, 1046 (Fla. 1982) (requiring "clear and unequivocal" consent from the Legislature to effect a waiver of sovereign immunity); *see also Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984) ("In Florida, sovereign immunity is the rule, rather than the exception. . . ."); *Univ. of Fla. Bd. of Trs. v. Rojas*, 351 So. 3d 1167, 1170 (Fla. 1st DCA 2022), *rev. granted,* SC2023-0126, 2023 WL 4784215 (Fla. July 27, 2023) ("Outside of claims brought under the federal or state constitutions, sovereign immunity bars suit against the State."); *cf. McElrath v. United States*, 102 U.S. 426, 440 (1880) ("The government cannot be sued, except with its own consent."). Public rights are "rights *of the public*—that is, rights

---

[2] FDLE relies nearly exclusively on decisions involving underlying suits pursuing general declaratory and supplemental injunctive relief under chapter 86, making these decisions inapposite to the limited analysis necessary for the current appeal.

pertaining to claims brought by or against" the government. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 68 (1989) (Scalia, J., concurring); *see also Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (characterizing matters of public rights as those that "arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments"); *Stern v. Marshall*, 564 U.S. 462, 485 (2011) (noting how the Court has contrasted cases involving a public right—"arising between the Government and persons subject to its authority"—with cases involving a "private right, that is, of the liability of one individual to another under the law as defined"). "[W]hat makes a right 'public' rather than private is that the right is integrally related to particular [government] action." *Stern*, 564 U.S. at 490–91; *cf. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 32 (2014) (distinguishing "between cases involving so-called 'public rights,' which may be removed from the jurisdiction of Article III courts, and cases involving 'private rights,' which may not").

By its very nature, a public right is the Legislature's waiving the State's immunity and consenting to suit, and in creating one, it "can declare in what court it may be sued" and "restrict the jurisdiction of the court to a consideration of only certain classes of claims against" it. *McElrath v. United States*, 102 U.S. 426, 440 (1880); *see also Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929) (explaining that when a legislature waives sovereign immunity to allow for the determination of claims against the government, "[t]he mode of determining matters of this class is completely within [legislative] control," meaning the legislative power can "reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals"); *Oil States Energy Servs., LLC*, 584 U.S. at 334 (noting the "significant latitude" given by precedent to the legislative power "to assign adjudication of public rights to entities other than Article III courts"); *cf. Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 455 (1977) (noting "that when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's [jury trial protection]," because "Congress is not

required . . . to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field").

The Legislature *could have* made the claim reflected in section 790.33 an administrative remedy, but it instead made the claim a statutory right of action, allowing that action to be filed against government officers and adjudicated in a court exercising judicial power under Article V of the Florida Constitution. *See* § 790.33(3)(a), (f)1., Fla. Stat. In other words, for harm flowing from a violation of section 790.33, the public right to sue the State in court *is the remedy*. There was no sense requiring the plaintiffs to pursue some alternative, administrative remedy first. By direction of the Legislature, the circuit court has jurisdiction to adjudicate the plaintiffs' claim, making it, and not an agency of the executive branch, the proper forum. The suit before it not being one under Florida's Declaratory Judgment Act, the circuit court had no discretion to send the plaintiffs away—no choice but to entertain the appellants' statutory right of action according to the terms legislatively established. The trial court, understandably, was following *Thrasher*, a decision properly being abrogated today, one inconsistent with Florida law.

Accordingly, I concur in the disposition and join parts I, II, III.A, III.B.1, and IV of the court's opinion.

B.L. THOMAS, J., concurs.

_____

Eric J. Friday of Kingry & Friday, PLLC, Jacksonville; David S. Katz and James D. Phillips of Katz & Phillips, P.A., Lake Mary; and Noel H. Flasterstein of the Law Offices of Noel H. Flasterstein, Boca Raton, for Appellants.

Kristen C. Diot, Jeffrey D. Slanker, Robert J. Sniffen, and Matthew J. Carson of Sniffen & Spellman, P.A., Tallahassee, for Appellees.